UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and ARTHUR H. BUNTE, JR., | ) ) ) ) | 14 CV 527 |
| Plaintiffs, | ) ) | Magistrate Judge Young B. Kim |
| v. | ) ) ) | |
| JEFFREY S. STEWART, | ) ) | November 25, 2015 |
| Defendant. | ) | |

## MEMORANDUM ORDER and OPINION

Before this court is Defendant Jeffrey S. Stewart's motion to enforce settlement. Stewart contends that the parties entered into a binding settlement agreement following a settlement conference held by this court on March 27, 2015. Plaintiffs Central States, Southeast and Southwest Areas Pension Fund and Arthur H. Bunte, Jr. (together "Central States") object to the motion, arguing that the parties never entered into a binding agreement and that even if they had, it would be unenforceable because it was obtained through fraud. For the following reasons, Stewart's motion is granted:

**Background**

This dispute centers around Chas J. Burnham ("CJB"), a warehousing business that made contributions to Central States, a multiemployer pension plan, on behalf of its union employees pursuant to a collective bargaining agreement ("CBA"). (R. 69, Pls.' Opp. ¶ 4.) During the relevant time period, Stewart was

President of CJB. (Id. ¶ 3.) Sometime in 2000 CJB became delinquent in its pension contributions to Central States and its subsequent withdrawal from the fund in December 2000 triggered statutory withdrawal liability. (Id. ¶¶ 5, 8.) In March 2001 Central States obtained a judgment against CJB for $47,153.10 in unpaid contributions ("Contributions Judgment"), and then in February 2002 Central States secured another judgment against CJB in the amount of $217,126.01 for the withdrawal liability. (Id. ¶¶ 6, 8.) Post-judgment discovery in connection with the withdrawal liability revealed other companies affiliated with CJB, and Central States obtained yet another judgment against one of them, Detroit Intermodal Transport, Inc. ("Detroit Intermodal"), as a jointly and severally liable controlled group member of CJB (collectively, "Withdrawal Judgments"). (Id. ¶ 10.)

Central States and counsel for CJB and Stewart, Attorney Donald Vogel, then engaged in over a decade of post-judgment settlement discussions during which the parties made little progress. (See id. ¶ 11; see also id., Exs. C-E; R. 78, Pls.' Sur-Reply, Ex. E.) Central States alleges that as of June 2015 it had collected less than a third of the Contributions Judgment from CJB through garnishments. (R. 69, Pls.' Opp. ¶ 7.) As for the Withdrawal Judgments, Attorney Vogel informed Central States in September 2010 that CJB "was no longer operating" and had "no assets," which Central States asserts led it to believe that the only avenue remaining to collect on those judgments would be to target the assets of Detroit Intermodal. (See id. ¶ 11.)

2

In July 2013, Attorney Vogel told Central States that Detroit Intermodal had "closed its doors in 2011" and that the company's liquidation proceeds were given to Stewart pursuant to a promissory note and a security agreement. (Id., Ex. E.) This prompted Central States to file the instant lawsuit against Stewart in January 2014 alleging that the transfer of proceeds from Detroit Intermodal to Stewart was improper. (R. 1.) During Stewart's deposition in this case on March 19, 2015, Stewart testified that CJB shut down "around 2000" because it "became antiquated." (R. 69-7, Stewart Dep. at 21:2-7.) He further testified that a property listed on his individual tax returns located at 6100 Linsdale Street, Detroit, Michigan ("Linsdale Property"), was never used for any of his companies "in any way." (Id. at 65:18-66:15.)

This court held an in-person settlement conference with the parties on March 27, 2015, and the parties reached an agreement. (R. 54.) That same day this court sent an email to the parties "summariz[ing] the material terms" that were "discussed and agreed to" at the settlement conference. (R. 66-1, Ex. A.) Those terms included, in relevant part, that in exchange for $100,000, Central States would "dismiss the case with prejudice" and release Stewart, Detroit Intermodal, "and the judgments and any liability from the withdrawal" of CJB. (Id.) The email also noted that the settlement agreement was "subject to the approval of Central States' board." (Id.) At the end of the email, the court asked the parties "to respond that these are the terms agreed to by the parties." (Id.) Both parties did so and confirmed their agreement via email. (R. 74, Def.'s Reply, Ex. A.) That day the

court also entered an order noting that the parties had reached an agreement subject to the approval of Central States' board and directing the parties to draft and exchange a written settlement agreement. (R. 54.)

According to Central States, in the weeks that followed "it became apparent that CJB did not actually shut down" as represented by Stewart and Attorney Vogel. (See R. 69, Pls.' Opp. ¶ 21.) In an email to Attorney Vogel on May 13, 2015, Central States' counsel, Attorney Emily Gleason, expressed concerns over possible inaccuracies in Stewart's testimony and raised several questions regarding, among other things, CJB's shutdown date and its use of the Linsdale Property. (Id.) But a week later on May 19, 2015, Central States' board approved the settlement. (See id. ¶ 23.) That same day the parties consented to the jurisdiction of this court. (R. 61.)

Meanwhile, Central States sent a proposed written settlement agreement to Attorney Vogel including language requiring Stewart to affirm the accuracy of contributions made to the pension fund, as well as a paragraph limiting the scope of the release to specific parties. (R. 66, Def.'s Mot. ¶¶ 6-9.) Stewart refused to accept Central States' draft and filed the current motion to enforce the settlement. In the volley of briefing that followed, Central States opposed Stewart's motion, (R. 69), Stewart filed a reply, (R. 74), Central States obtained leave to submit a sur-reply, and Stewart filed a response to Central States' sur-reply, (R. 78).[1]

---

[1] Stewart initially noticed a motion to enforce settlement before this court on April 30, 2015, (R. 58), and Central States filed a response on May 7, 2015, (R. 59). However, because this matter was only before the court on a referral limited to settlement discussions at the time, (see R. 60), the court disregards those earlier

4

Analysis

Stewart argues that Central States' proposed draft contradicted the agreed-to terms from the March 2015 settlement conference and that the original agreement should be enforced. (R. 66, Def.'s Mot. ¶¶ 9-10.) He contends that he made clear at the outset of the settlement conference that any agreement would need to include a full release from any liability arising from CJB's withdrawal from the pension fund, and that the parties agreed to a comprehensive release. (Id. ¶ 2.) According to Stewart, Central States' draft improperly limits the scope of the agreed-upon release and attempts to leave open a claim regarding the accuracy of CJB's pension contributions. (Id. ¶¶ 7-8.) In response, Central States contends that there is no settlement agreement to enforce because any agreement was preliminary and specifically required that the parties enter into a formal written agreement. (R. 69, Pls.' Opp. ¶ 1.) Central States also argues that the settlement was conditioned on board approval, which itself was conditioned upon verifying the truth of Stewart's representations. (Id. ¶ 37.) Furthermore, according to Central States, even if an enforceable settlement agreement exists, it was fraudulently induced and therefore is void. (Id. ¶¶ 39-48.)

A.  **Enforceability of Settlement Agreement**

This court has the inherent authority to enforce a settlement agreement in a case pending before it. *Wilson v. Wilson*, 46 F.3d 660, 664 (7th Cir. 1995). Although an evidentiary hearing is necessary "where the material facts concerning the

---

briefs and bases its opinion solely on the parties' submissions after the parties consented to this court's jurisdiction, (see R. 61).

5

existence or the terms of an agreement to settle are in dispute," *id.*, where the record resolves any material fact disputes, a hearing is not required, *Zendejas v. Reel Cleaning Servs., Inc.*, No. 05 CV 6933, 2009 WL 2431299, at *23 (N.D. Ill. Aug. 6, 2009). Because neither party here has requested an evidentiary hearing and the material facts are not in dispute, the court is satisfied that this matter can be resolved without taking evidence beyond what is set out in the parties' briefs and exhibits. *See Elustra v. Mineo*, 595 F.3d 699, 710 (7th Cir. 2010); *see also Hakim v. Payco-General Am. Credits*, 272 F.3d 932, 935 (7th Cir. 2001) ("[If] a court can have reasonable confidence that it knows what the contract means, it ought not put the litigants (and the trier of fact) to the bother, expense, and uncertainty of a trial or other evidentiary hearing." (citation omitted)).

In reviewing a motion to enforce, the court treats a settlement agreement as it would any contract, looking to state contract law to decide how the agreement should be construed and whether it should be enforced. *Newkirk v. Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008); *Laserage Tech. Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992). Central States argues that because the parties agreed to formalize and sign a written agreement after the settlement conference, and no contract was executed, no binding agreement exists. (R. 69, Pls.' Opp. ¶¶ 35-36.) But in Illinois, the fact that a settlement is not reduced to writing does not make it unenforceable, *see Lynch, Inc. v. SamataMason, Inc.*, 279 F.3d 487, 490 (7th Cir. 2002), unless "the reduction of an agreement to writing and its formal execution is objectively intended by the parties as a condition precedent to its

6

completion[.]" *Trendmasters Inc. v. Walgreen Co.*, No. 95 CV 5379, 1996 WL 422273, at *2 (N.D. Ill. July 24, 1996). Here, even though a formal agreement was anticipated, neither party expressly made clear that their mutual obligations were dependent on the execution of a final contract. *See Abbott Lab. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388 (7th Cir. 1999) ("As a general rule, anticipation of a more formal future writing does not nullify an otherwise binding agreement."); *see also Johnson v. BP Exploration & Prod. (In re Horizon)*, 786 F.3d 344, 354 (5th Cir. 2015). In fact, rather than add or make corrections to the court's email memorializing the settlement, Central States agreed to the enumerated terms and only made suggestions regarding the form of payment. (R. 74, Def.'s Reply, Ex. A.) Some details of the settlement were left unaddressed, but courts enforcing Illinois law have not been shy about enforcing promises involving incomplete agreements. *See Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992) (citations omitted); *Porter v. Chi. Bd. of Educ.*, 981 F. Supp. 1129, 1131 n.4 (N.D. Ill. 1997). And the parties do not dispute that the material terms were sufficiently definite to be enforceable. *See Seko Worldwide, LLC v. Four Soft Ltd.*, 503 F. Supp. 2d 1059, 1061 (N.D. Ill. 2007). Accordingly, Stewart has met his burden of proving that a binding settlement agreement exists. *See Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11 CV 4462, 2014 WL 4724387, at *5 (N.D. Ill. Sept. 23, 2014).

Central States further attempts to undermine the agreement's validity by asserting that board approval for the settlement was "conditioned on resolving the discrepancies between the representations made by Stewart and subsequent

information." (R. 69, Pls.' Opp. ¶ 23.) However, Central States does not dispute that the board approved the settlement, and it presents no evidence to support that this approval was conditional or somehow ineffective. (See R. 69, Pls.' Opp. ¶¶ 23, 37.) The board could have withheld its approval pending verification of Stewart's representations, but by giving its approval the board satisfied the only necessary pre-condition agreed to by the parties. In light of the above, the court finds that the parties entered into a valid and enforceable agreement in accordance with the terms enumerated in this court's post-settlement-conference email.

## B. Fraudulent Inducement

Central States contends that even if the parties did enter into a valid settlement agreement, it is unenforceable because it was fraudulently induced. Under Illinois law, a party seeking to set aside an otherwise enforceable contract on the basis of fraudulent inducement must prove the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003); *see also Lewis v. Sch. Dist. #70*, 648 F.3d 484, 487 (7th Cir. 2011). The party alleging fraudulent inducement must also establish that his belief in, and reliance on, the statement was reasonable. *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1207 (7th Cir. 1998). Fraudulent inducement, like all fraud

8

under Illinois law, must be established by clear and convincing evidence. *Amari Co. v. Burgess*, 955 F. Supp. 2d 868, 884 (N.D. Ill. 2013) (citations omitted).

Central States' fraudulent inducement argument fails for multiple reasons. It bases its fraud assertions on Stewart's representations that CJB "shut down" and ceased operations sometime between 2000 and 2003. (See R. 69, Pls.' Opp. ¶ 44.) But Central States has not offered clear and convincing evidence that such representations were false. It points to the fact that CJB's corporate name is still current and active. (See id. ¶ 24.) But Stewart only represented that CJB had shut down and ceased operations, not that it ceased to exist. (See id. ¶¶ 11, 17, 24.) In fact, Attorney Vogel advised Central States' counsel in a September 2010 email that CJB "was no longer operating" and would "be allowed to die" if the parties could not reach a resolution, but that "[t]he entity and name is kept alive in case some opportunity presents itself in the future" and "to avoid having to reapply[.]" (Id., Ex. C.) Although proof of CJB's corporate existence in Michigan indicates that CJB *could* still be operating, such evidence falls short of showing that CJB was *in fact* operating.

Central States' reliance on marketing materials from CSX is also unavailing. Central States asserts that CSX documents from 2009 and 2012 listing CJB's facilities as one of its serviced warehouses proves that CJB was still operating after it had purportedly shut down. (R. 78, Pls.' Sur-Reply at 3.) However, information conveyed in third-party marketing materials over which neither Stewart nor CJB has control is not enough to demonstrate that CJB was actively doing business with

9

CSX, especially given the affidavit from a CSX paralegal stating that CSX has no records of any payments made to or received by CJB. (R. 74-6, Wiggins Aff. at 2.) The affidavit further states that although "[a]t some point in time . . . CSX listed [CJB] as a CSX rail-served warehouse[,]" the paralegal was "unable to determine the last time the information on the brochure was updated." (Id.) And, without some evidence regarding the source of the information, the mere fact that materials referencing CJB were created or updated after 2003 is insufficient to clearly and convincingly prove that CJB was still in the warehousing business after 2003.

That being said, Central States has presented other evidence showing that CJB entered into a CBA with a union in September 2005 and that the CBA was effective at least through 2008. (See R. 69, Pls.' Opp. ¶¶ 24-29; R. 78, Pls.' Sur-Reply at 2, 4.) Stewart insists that the CBA does not prove that CJB was still in business, (R. 74, Def.'s Reply at 10), but Central States persuasively points out that if CJB had ceased operating, the CBA would have been unnecessary, (R. 78, Pls.' Sur-Reply at 4). Furthermore, the CBA named one employee at CJB who should receive wages in 2005. (See R. 69-44, Ex. K at 17.) Although the CBA constitutes more compelling evidence of CJB's alleged ongoing operations than Central States' other evidence, it still falls short. The Seventh Circuit has defined "clear and convincing" evidence as that which leaves "no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Davis v. Combes,* 294 F.3d 931, 936-37 (7th Cir. 2002) (internal quotations and citations omitted). The fact that CJB was a signatory to a CBA and appears to have had one employee does

not lead this court to conclude that CJB was still in the warehousing business. Again, Stewart did not represent that CJB ceased to exist, or that it was not a party to any contracts. Rather he testified during a discussion of CJB's warehousing business that CJB "shut down" after becoming "antiquated." (See R. 69-7, Stewart Dep. at 20:14-21:20.) This court cannot say, based on Central States' evidence, that it has no reasonable doubt that Stewart's statements regarding CJB's shut down were false.

As for the Linsdale Property, Stewart does not appear to contest the inaccuracy of his testimony that none of his companies had ever used the property. (See id. at 65:18-66:15.) According to Attorney Vogel and the CBA, CJB actually ran its warehousing business from the Linsdale Property. (See R. 69-11, Ex. K at 4; R. 69-12, Ex. L at 7.) But while Central States succeeds in establishing the falsity of Stewart's statement regarding the property, it fails to show that this misrepresentation was material. In Illinois, a misrepresentation is material if the plaintiff "would have acted differently had [it] been aware" of the misrepresentation, or if it "concerned the type of information upon which [the plaintiff] would be expected to rely" in making a decision to act. *See Oshana v. Coca-Cola Co.*, No. 04 CV 3596, 2005 WL 1661999, at *3 (N.D. Ill. July 13, 2005) (citations omitted); *see also Barrington Press, Inc. v. Morey*, 752 F.2d 307, 310 (7th Cir. 1985). Central States argues that had it known about CJB's previous use of the Linsdale Property, it could have attempted to collect from Stewart and other related entities under a successor-in-interest theory of liability before deciding to settle.

(See R. 69, Pls.' Opp. ¶¶ 44-45.) As an initial matter, the simple fact that related entities have ties to the same property is hardly conclusive evidence of a successor-in-interest relationship. More importantly, Central States has not convincingly shown that becoming aware of the mere possibility of additional avenues for collection would have altered its decision to settle. At the time of the settlement conference, Central States had already been pursuing collection for over a decade with little success. (See id. ¶¶ 7, 11.) By its own account, Central States had conducted years of discovery, obtained a judgment against Detroit Intermodal, and engaged in "over a decade" of post-judgment settlement discussions. (See id. ¶¶ 10-11.) Given the posture of this case, the court has difficulty concluding that the unearthing of evidence merely hinting at potential successor liability would have played a substantial role in Central States' decision to settle. *See Archdiocese of Milwaukee v. Appeal of Doe*, 743 F.3d 1101, 1108 (7th Cir. 2014) (finding misrepresentations immaterial because they were not a "substantial factor" in party's decision to accept the settlement).

Regardless, even if Central States' evidence were sufficient to show that Stewart's statements were material and false, its fraudulent inducement claim would still ultimately fail because relying on Stewart's representations was unreasonable. In determining whether a party's reliance was reasonable, Illinois law directs courts to ask whether the party had a right to rely on the statement in light of the surrounding facts. *See Triumph Packaging Grp. v. Ward*, 877 F. Supp. 2d 629, 647 (N.D. Ill. 2012) (citing *Cozzi Iron & Metal, Inc. v. U.S. Office Equip.,*

*Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) ("we must consider all of the facts that [plaintiff] knew, as well as those facts [plaintiff] could have learned through the exercise of ordinary prudence")). A party cannot enter into a transaction with its eyes closed to available information and then complain that it was deceived. *See Cannon v. Burge*, 752 F.3d 1079, 1093 (7th Cir. 2014) (citing *D.S.A. Fin. Corp. v. Cnty. of Cook*, 345 Ill. App. 3d 554, 561 (2003)); *Cozzi Iron*, 250 F.3d at 574 (citations omitted).

According to Central States' own emails, it became aware of CSX's records and CJB's use of the Linsdale Property prior to the board approving the settlement. In his email to Attorney Gleason on May 11, 2015, Attorney Vogel wrote that CJB used to operate from the Linsdale Property. (R. 69-10, Ex. J at 5.) Two days later, Attorney Gleason replied that Central States had "more concerns" regarding the extent to which CJB had ceased operations and whether other entities were successors or alter egos of CJB. (Id. at 4-5.) Yet, despite these concerns, Central States secured board approval for the settlement a week later on May 19, 2015. As already noted, Central States provides no clear and convincing evidence that the board's approval was conditional or otherwise ineffective. The board could have withheld its approval pending verification of Stewart's representations, or it could have refused to approve the settlement upon discovering the alleged inconsistencies and forced the parties to re-negotiate or continue litigating. But the board granted its approval despite its concerns and must now live with the agreement.

It is worth noting that Central States also had forewarning that it should not accept Stewart's representations at face value given previously unearthed inconsistencies regarding Detroit Intermodal. (See R. 69, Pls.' Opp. ¶¶ 12-16.) Under Illinois law, justifiable reliance exists when it was reasonable for a party to accept statements "without an independent inquiry or investigation." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012). According to Central States' own allegations in the current lawsuit against Stewart, Central States had every reason to conduct its own investigation into whether CJB had shut down prior to agreeing to settle. And as Stewart points out, it appears that Central States could have discovered much of the evidence it now presents by simply running internet searches. (See R. 79, Def.'s Opp. to Sur-Reply at 4); *see also D.S.A. Finance Corp. v. Cnty. of Cook*, 345 Ill. App. 3d 554, 560 (2003) ("To find justifiable reliance, the court considers whether the party was reasonable in relying on his adversary's representation in light of the facts within his actual knowledge and any he might have discovered by the exercise of ordinary prudence."). Settlements are meant to substitute certainty for risk, but that does not make them risk-free. *See Billhartz v. C.I.R.*, 794 F.3d 794, 799 (7th Cir. 2015). By settling, Central States closed the door to new information, both helpful and harmful. *See id.* Because the board approved the settlement in the face of known risks and concerns, even if Central States could prove Stewart's statements were false its reliance on those statements was unreasonable.

## Conclusion

For the foregoing reasons, Stewart's motion to enforce the terms of the settlement reached at the March 27, 2015 settlement conference is granted.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**